# GARRETT v. INTERNATIONAL TRAVELERS' ASS'N et al.   (No. 9247.)

Court of Civil Appeals of Texas. Galveston.
Feb. 12, 1929.

Rehearing Denied Feb. 28, 1929.

Fine G. Bedford, of Galveston, and Williams, Williams, McClellan & Lincoln, of Waco, for appellant.

Levy, Levy, Barker & Kahn, of Galveston, and Seay, Seay, Malone & Lipscomb, of Dallas, for appellees.

LANE, J.   On the 9th day of February, 1925, International Travelers' Association, a corporation incorporated under chapter 5, title 71, Revised Civil Statutes of 1911, as a home mutual accident company, for the purpose of transacting the business of accident insurance upon the mutual payment plan, without capital stock and without lodges, hereinafter for convenience referred to as the association, issued its accident and health policy by which it insured Holland T. Garrett against loss resulting from bodily injuries effected directly, independently, and exclusively of all other causes through accidental means, subject to· the terms, provisions, and limitations in the policy.   Mrs. Mollie E. Garrett, mother of insured, was named as beneficiary in the policy.

It is provided by article 1 of such policy that in case of death effected directly, independently, and exclusively of all other causes through accidental means, the association would pay the beneficiary the sum of $5,000. Article 6 of the policy is as follows:

"Special Indemnities.

"Blood Poisoning—Septicæmia.

"Blood poisoning or septicæmia resulting directly from bodily injuries shall be deemed

to be included in said terms, 'bodily injuries.'"

Section 5 of article 11 of the policy is as follows:

"The term 'bodily injuries,' wherever used in this policy, shall be understood to be bodily injuries effected as described in the insuring clause."

On the 20th day of January, 1926, while the policy was in force and effect, Holland T. Garrett, the insured, died as a result of blood poisoning. Due notice and proof of such death was given to the association. Thereafter, in due time and manner, the beneficiary named in the policy made demand upon the association for payment of the amount due on the policy; thereupon the association, on or about the 8th day of June, 1926, refused and thereby failed to pay said sum so due.

Thereafter, on the 31st day of March, 1927, the association and the International Travelers' Assurance Company, hereinafter called the Assurance Company, entered into agreement, by the terms of which the association assigned and set over to the Assurance Company all of its properties and assets, admitted and not admitted, in consideration for which the Assurance Company agreed to reinsure and did reinsure all the policies theretofore issued by the association which were in force April 1, 1927, and to assume any and all liability outstanding against the association on the 1st day of April, 1927, and to assume and carry out the full obligations of the association evidenced by policies issued by it prior to April 1, 1927, and to make no defense against such policies, except such as could have been made by the association itself.

The Assurance Company was and is incorporated under provisions of chapter 3, title 78, of the Revised Civil Statutes of 1925, and is what is known as an old line company. On the 12th day of January, 1928, after the aforesaid agreement had been entered into, and after the Assurance Company had taken over all the properties, assets, etc., of the association, by virtue of said agreement, Mrs. Mollie E. Garrett, the beneficiary named in the policy, by and through her attorneys, made demand in writing upon the Assurance Company for payment of the sum due by the terms of the policy, to wit, $5,000, with legal interest thereon. Said Assurance Company refused to make the payment demanded, or any part thereof.

Upon such refusal, Mrs. Garrett brought this suit on the 13th day of January, 1928, against the association and the Assurance Company, jointly, to recover on the policy the sum of $5,000, together with interest thereon, and to recover the statutory penalty and attorney's fees, as provided by law, which she alleged to be the sum of $2,000.

The plaintiff alleged that the insured died as the result of "bodily injuries effected directly, independently, and exclusively of all other causes through accidental means," in

that he died from an accidental injury to his nose and its coincident inoculation or infection with germs or bacteria, which infection rapidly spread and caused carbuncular infection of insured's face and scalp, or, in other words, septicæmia or blood poisoning; that insured, because of cold with which he was afflicted, or some other reason, rubbed his nose, picked at it, or irritated it with his hands and with his handkerchief, and by such means produced an abrasion of the skin or mucous membrane of the nose, through which injury and by which means, coincidentally with the use of the means and infliction of the injury, there was introduced into the insured's system the septic matter or germs which resulted in blood poisoning or septicæmia.

Alternatively, appellant alleged that, if mistaken in her allegation that the means which produced the injury to insured's nose produced also, coincidentally therewith, the blood poisoning, then the infection was communicated by the use of the means aforesaid applied as an exterior force to inject and introduce the germs, which act of injection and communicating the infection constituted a bodily injury from which blood poisoning occurred as a direct result; that whatever the focus of infection, and whether or not there was a preceding or coincident abrasion of the covering of the nose, the aforesaid act of insured whereby septic matter and germs were injected into his system constituted an accidental bodily injury from which blood poisoning and death directly resulted; that blood poisoning, whether accompanying or following directly and proceeding from a bodily injury, was, under the facts alleged, a contingency expressly insured against by the terms of the policy in suit.

Defendants filed a joint answer, by which they pleaded a general denial, and specially pleaded section 5 of article 11 of the policy, whereby the term "bodily injuries," as used in the policy, is defined to be such only as is described in the insuring clause of the policy; that is, such "bodily injuries" as were received through violent, external, and accidental means. They alleged that the infection from which the insured died resulted from his previous diseased condition, or that such diseased condition co-operated in causing his death, and that they were not liable to the plaintiff under the terms of the policy for death caused by either of such conditions.

The association pleaded the fact that it was incorporated under chapter 5, title 71, Revised Civil Statutes of 1911, and was not amenable to penalties and attorney's fees, as provided by law against old line companies. The Assurance Company pleaded that it assumed all liabilities of all kinds and character of the association existing on March 31, 1927, but only such as then existed; that the insured died on the 20th day of January,

1926, more than a year prior to the assumption of liability by it of the obligations of the association, and, as said association was not liable for statutory penalties and attorney's fees, the Assurance Company was not liable therefor, as it did not assume any such liability, there being none to assume.

On the trial appellees offered no evidence whatever. At the conclusion of appellant's evidence the trial court granted appellees' motion for peremptory instruction, and judgment was entered accordingly that appellees go hence without day and recover their costs. Mrs. Garrett has appealed.

As cause for a reversal of the judgment of the trial court, appellant insists that the court erred in peremptorily instructing a verdict for the defendants, and in rendering judgment for defendants upon a verdict returned in accordance with such instructions, in that the evidence was and is sufficient to support a finding by a jury that blood poisoning, from which insured died, was the result of an external force; that such blood poisoning was received through "accidental means"; that blood poisoning was not the natural consequence of a pre-existing disease, but that insured's diseased condition, if any, at most furnished a condition upon which an intervening agency operated to cause blood poisoning and death; therefore the court should have submitted the issues raised by the evidence to the jury, and it erred in not so doing; that blood poisoning is a contingency expressly insured against under the policy, to the extent, at least, that when death results from such cause, consequent upon bodily injury, blood poisoning "will be deemed," as provided in the policy, "a bodily injury effected directly, independently, and exclusively of all other causes through accidental means"; that it is a reasonable inference from the facts and circumstances shown that insured's death was an unexpected, unusual, and unforeseen result of his act in rubbing his nose with his hand and handkerchief, and that his death was accidental and caused by accidental means.

We think the contentions of appellant should be sustained. It was shown that just preceding his death the insured had a cold; that during such period he rubbed his nose with his hand and handkerchief and picked at it with his hand; that he had a pimple or sore on his nose, which he rubbed and squeezed with his hand and handkerchief; that his nose during the times mentioned was raw and chafed as a result of the rubbing and picking he gave it; that it was affected with blisters and pimples. It was shown that bacteria or germs were present on insured's hands and handkerchief and about his nose at the times mentioned; that they were always present on his hands and nose; that he died from a carbuncular infection of the nose, which spread over his face and head;

and it was also shown that such an infection constituted blood poisoning, or septicæmia, as those terms are used in the policy, and that such infection could arise only through the introduction of germs from the outside.

The evidence raised the issue as to whether carbuncular infection was present on insured's hands and handkerchief and about his nose at the times above mentioned. The showings above mentioned are not presumptions drawn from presumptions, as contended by appellee, but they are the ultimate facts, drawn as reasonable inferences from a group of facts and circumstances testified to by witnesses. In 22 Corpus Juris, p. 84, § 27, it is said: "It is permissible for a court or jury to draw several conclusions or presumptions of fact on the same circumstances, and, in order that presumption may be indulged, it is not necessary to believe that the thing presumed has been actually done, but it is sufficient if the evidence leads to a conclusion that it may have been done, and that its existence would be the solution of the difficulty arising from its nonexistence."

We think the jury might have reasonably found from the evidence that insured infected his nose by rubbing it and picking at it with his hands and handkerchief; that the carbuncular infection resulted from an external force, to wit, the rubbing and picking of the nose as above mentioned, rather than from natural causes. Dr. Duve testified that he had been for many years the family physician of Garrett and knew that his general health had been good, and, testifying further, he said:

"In the course of my practice I have had occasion to treat carbuncles and carbuncular infections, boils, and things like that a great number of times. In my experience I have noticed more carbuncular infections at the back of the neck and shoulders. I have never seen in my experience a carbuncular infection of the face. I will state that in my judgment and opinion a carbuncular infection of the face is of unusual and infrequent occurrence. My patients have had carbuncles, lots of them. My patients have had colds, and lots of them. None of their colds ever resulted in a carbuncular infection of the face. It is barely possible that a carbuncular infection, in the absence of an artificial abrasion, or opening in the skin, may be communicated to the underlying tissues through the hair shafts or sweat glands or mucus glands, or anything that way; it is barely possible, but hardly probable. * * *

"Now, as to the most probable means of it being communicated, I will state the chances are it may be caused by a slight abrasion of the skin, or an inflamed area, whereby the germs will gain entrance into the skin through the skin, or through a hair shaft. I have said that could be done either way. The most probable way a carbuncular infection is com-

municated would be from an exterior force or trauma, for the reason that most cases are on the neck, where the sweatband, or collar button, probably irritates the skin and pores.

"Assuming that a germ or germs of carbuncular infection are communicated through an abrasion of a traumatic nature in the skin, by force of rubbing, or by the fingers used in picking the nose, and that an infection results, where this condition exists it is probable that the abrasion and the infection occurred at the same time. I will state there would be more probability of infection from picking it with the fingers, or rubbing it, probably with a handkerchief that was not clean, than there would be in it coming through a hair shaft. The matter of force and rubbing applied to the area, germs being present, as to whether or not that would tend to drive the germs in, I will state, nature has thrown a wall around there to protect it, and the rubbing or pressure would have a tendency to spread the germs.

"In answer to the hypothetical question, 'Assume as true that on the 7th day of January, 1926, Holland Taylor Garrett had a cold, with probably an inflammation of the sinus area, and that his nose was on that night—the skin of the nose was found to be swollen, red and broken, and assume that by the 9th day of January there was at the lower edge of the nose a carbuncular infection, and assuming that during the time covered by the question that Holland Taylor Garrett had been rubbing his nose with his handkerchief and with his hand, and picking at it with his fingers; that in my opinion would cause the infection. Under the conditions as outlined in the question, assuming that to be true, the infection could have resulted from the rubbing of his nose with his hand and handkerchief, and from his having picked at his nose with his fingers.

"I remember the conditions that were assumed with reference to the existence of a cold, with the sinus inflamed, and the existence of a red, irritated, and broken condition of the skin of the nose, and now, assuming that, while the nose is in that condition, but before there is any infection of the nose, the area is rubbed with the hands, with the hand and a handkerchief, and picked at by the fingers, and later a carbuncular infection of the nose at the lower extremity is definitely ascertained, I will then state, in my opinion, that the rubbing of the nose and the picking at it was a probable source of the infection. Assuming the conditions already stated with reference to the cold, and with reference to the sinus being involved, and assuming that by the use of the hand and handkerchief, as has been mentioned, an abrasion or breaking of the skin of the nose is caused, and subsequently, within a short time, a few days at most, a carbuncular infection is definitely ascertained, I will state in my opinion the means which caused the abrasion at the same time communicated the infection.

"I stated on cross-examination that rubbing with the hand or handkerchief over an abrasion of the skin is calculated to cause an infection, a carbuncular infection, of the nose, and I will state, I mean by that that, where an infection results, it occurs probably as a result of the rubbing, probably as a result of rubbing with infected fingers or an infected handkerchief. I do not mean to say that in a usual or ordinary case of cold, where a place is inflamed, that a carbuncular infection would result. I said that in all my experience as a doctor treating colds that has never occurred. I say that infection does occur, and more probably the source of the infection would be by the rubbing of the hand or handkerchief over an open surface."

Dr. Wall testified that it would be more probable that the germs of infection would go through the covering of the nose by the impetus of rubbing.

Dr. Singleton testified that the cause of Garrett's death was septic or blood poisoning from a carbuncular poisoning. Testifying further, he said:

"Assuming that this young man, Mr. Garrett, about the 7th day of January, 1926, had a cold, and that on that night, at least, his nose was irritated, and a break in the skin of the nose, and a condition where pimples were present, or cold blisters, and with his nose in that condition, he rubbed his nose with his handkerchief, and with his hand, and picked at. it, that could have been a means of communicating the infection which I later observed. My answer that such a condition could have been the source of the infection would assume there was present on his hand or handkerchief, or that area there, bacteria. Bacteria can be carried on a handkerchief, and they are always present on the hands. That form of bacteria which produced this infection is always present on the hands, and in the nose, and probably everywhere else about you.

"With the bacteria present, as I have just stated it is always, the use of the hands and handkerchief in rubbing an opening or abrasion in the skin would be reasonably calculated to inject the bacteria into the tissues; if you had bacteria on your hands or handkerchief, and it came in contact with an abrasion, you could reasonably expect it to affect a raw tissue.

"I stated that bacteria is always present on the hands. It is also about the nose, on the outside and on the inside, in your mouth and everywhere; bacteria is present everywhere, except where the surface or other lining is covered. Now, with that in view, if you rubbed the surface, it would probably be a means of injecting the bacteria through the covering into the inner tissue; if you would rub the surface, and the bacteria was on there, it probably would get in the tissues

where it could grow, and if the surface had not been rubbed, and if that bacteria had not gotten through the surface, they probably would not grow."

Whether the blood poisoning from which insured died was the result of an external force, received through accidental means, or was the natural consequence of a pre-existing disease, was a question for the determination of the jury.

In the case of Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S. W. 673, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517, Chief Justice Phillips, of our Supreme Court, quotes with approval the definition of the term "accidental means," as used in policies such as the one under consideration, made by the United States Supreme Court in United States Mutual Accident Association v. Barry, 131 U. S. 100, 9 S. Ct. 755, 33 L. Ed. 60, as follows: "The term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected'; * * * that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means."

In the Bryant Case the facts showed that the insured died from sunstroke, caused by exposure to the sun on a hot day while pursuing his usual avocation as collector of accounts in his ordinary way. Our Supreme Court in that case held the insured's death was caused by "accidental means."

In Robinson v. Ætna Life Insurance Co. (Tex. Com. App.) 276 S. W. 900, the term above mentioned is defined as meaning "happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected"; an event which takes place without the foresight or expectation of the person acted upon.

In Fort Worth Mutual Benevolent Association v. Miller (Tex. Civ. App.) 280 S. W. 338, it is said: "It may be said that the death of Mrs. Miller falls within the definitions from Words and Phrases and from Black's Dictionary, above given, in that the thing or cause or agency which produced her death was the rupture of the blood vessel in her brain, and that, while her act in pushing the car was voluntary, the result was wholly unexpected. And this conclusion seems to accord with the decision of Chief Justice Phillips in the case of Bryant v. Continental Casualty Co., 182 S. W. 673, 107 Tex. 582, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517. * * * While numerous authorities have been examined, and while we have had some difficulty in arriving at a determination, we have finally concluded that, under the authority of the Bryant and Barry Cases, supra, we must repudiate the contention here made, as in the Barry Case, that, because Mrs.

Miller voluntarily engaged in the pushing of the car, and because there was nothing unintended or unusual in her acts, therefore her death does not come within the obligatory clauses under consideration. It may be said that the immediate cause of the death was the bursting of the blood vessel and not the pushing of the car; that the result was unintended and unexpected, and hence such as insured against. See, also, the cases of International Travelers' Ass'n v. Branum (Tex. Civ. App.) 169 S. W. 389, and Robinson v. Ætna Life Ins. Co. (Tex. Com. App.) 276 S. W. 900, and cases therein cited."

As supporting appellant's contention we cite the following cases: Frances v. International Travelers' Ass'n (Tex. Civ. App.) 260 S. W. 938; Horton v. Travelers' Ins. Co., 45 Cal. App. 462, 187 P. 1070; Interstate Business Men's Accident Ass'n v. Lewis (C. C. A.) 257 F. 241; Business Men's Accident Ass'n v. Schiefelbusch (C. C. A.) 262 F. 354; Lewis v. Ocean Accident & Guarantee Corp., 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129; Townsend v. Commercial Ass'n, 231 N. Y. 148, 131 N. E. 871, 17 A. L. R. 1001; Caldwell v. Iowa State Traveling Men's Ass'n, 156 Iowa, 327, 136 N. W. 678, and many other authorities cited in appellant's brief.

In the Caldwell Case, last cited, it is said: "It has been repeatedly held that, in the absence of direct evidence on the subject, a presumption arises that the wound was not intentionally inflicted either by the assured or by another. This presumption is almost the equivalent of a presumption that the wound was inflicted through accidental means. The authorities, however, stop short of announcing the presumption in this later form. They do hold, however, that the presumption first stated is available to the plaintiff as affirmative evidence, and that an inference may be drawn therefrom by the triers of fact that the wound was caused by accidental means as the only other alternative."

By appellant's fourth proposition it is insisted that the court erred in instructing a verdict for appellees, because there was evidence sufficient to sustain a verdict by the jury that insured died, directly, independently, and exclusively of all other causes, from blood poisoning or septicæmia, a contingency expressly insured against by article 6 of the policy, which reads as follows:

"Special Indemnities.

"Blood Poisoning—Septicæmia.

"Blood poisoning or septicæmia resulting directly from bodily injuries shall be deemed to be included in the said term bodily injuries."

Appellant's contention under this proposition is that, as the article mentioned is so prominently inserted in the policy, it should be held that blood poisoning or septicæmia, however incurred, or on whatever account, is

a contingency expressly insured against, and signifies a special indemnity, and that by such provision appellees intended that the insured should be led to believe that it provided a special indemnity against blood poisoning, regardless of how it occurred.

The insuring clause (the first clause) of the policy indemnifies *"against loss resulting from bodily injuries effected directly, independently and exclusively of all other causes, through accidental means,* * * * subject to the terms, *provisions and limitations in this policy."*

By section 5 of article 11 of the policy it is provided: *"The term 'bodily injuries,' whenever used in this policy, shall be understood to be bodily injuries effected as described in the insuring clause."*

We are not inclined to agree with the contention of appellant last stated, but, in view of the conclusions reached by us relative to the right of appellant to have the cause submitted to the jury upon other issues above stated, it is unnecessary to discuss this contention. Having reached the conclusions above expressed, it becomes our duty to reverse the judgment and remand the cause; and it is accordingly so ordered.

Reversed and remanded.