Marion T. Hibbs, Plaintiff in Error, v. United States Fidelity & Guaranty Company, Defendant in Error.

Gen. No. 34,841.

Opinion filed June 26, 1931. Rehearing denied July 7, 1931.

WILLIAM McKINLEY and PAUL E. PRICE, for plaintiff in error.

Edward W. Rawlins and Eugene P. Kealy, for de- fendant in error; Fay Warren Johnson, of counsel.

Mr. Presiding Justice Gridley delivered the opinion of the court.

In an action in assumpsit, commenced on November 3, 1927, and based upon defendant's policy of accident insurance, there was a trial before a jury in June, 1930. At the conclusion of plaintiff's evidence the court instructed the jury to return a verdict in defendant's favor, which was done, and judgment was entered against plaintiff for costs. She sued out the present writ of error to reverse the judgment and the main question is whether, under the provisions of the policy and plaintiff's evidence, the court erred in so instructing the jury and in entering the judgment.

The policy, originally issued to plaintiff's husband on April 6, 1923, and thereafter kept in force by annual renewals up to April 6, 1928, provided in part that defendant "does hereby insure Willam R. Hibbs, hereinafter called the insured, . . . in the principal sum of $5,000,

(1) Against loss, as hereinafter defined, resulting directly and independently of all other causes from *accidental* bodily injuries, fatal or non-fatal, being hereinafter referred to as 'such injury,' as follows:

Death, Dismemberment, Loss of Sight, Speech or Hearing

Schedule I. . . .

(b) Or, if within six months from the date of accident, irrespective of total disability, 'such injury' shall directly result as aforesaid in one of the losses specified under Specific Losses, the Company will pay the sum set opposite such loss, . . .

### Specific Losses

Loss of Life..............The Principal Sum. . . . Schedule III.

(a) Sunstroke, Freezing, Hydrophobia or Asphyxiation, due solely to 'such injury,' shall be covered by this policy.

### Blood Poisoning

(b) Blood Poisoning resulting directly from 'such injury' shall be covered by this policy. . . .

### Standard Provisions. . . .

*To Whom Indemnities Payable.* 11. Indemnity for loss of life of the insured is payable to the beneficiary, if surviving the insured, otherwise to the estate of the insured. . . .

### Additional Provisions. . . .

*Injuries Not Covered.* 21. This policy does not cover any accidental bodily injury caused or contributed to, directly or indirectly, by sickness or disease, . . ."

Plaintiff's declaration consisted of two counts, to which were attached a copy of the policy and an affidavit of merits, claiming that $5,000 was due to her. In one count, after setting forth the issuance of the policy and some of its provisions, she alleged that she is the beneficiary of the policy; that on July 3, 1927, while the policy was in force, the insured died "as the result of an infection following the extraction of a tooth"; that his death "resulted directly and independently of all other causes from accidental bodily injuries"; that during his lifetime the insured kept and performed all the terms and conditions of the policy on his part to be kept and performed; that upon his death she gave to defendant due notice thereof, but it refused to furnish forms for filing proofs of loss, and that by reason thereof, within apt time, she

submitted to it written proofs as to the occurrence and the character and extent of the loss; and that she has demanded of defendant payment of said sum of $5,000, but the demand has been refused, etc. The other count is substantially the same, except that it does not particularize as to the cause of the death and merely alleges that the insured came to his death on said date "directly and independently of all other causes from accidental bodily injuries," while the policy was in full force and effect.

Defendant filed a plea of the general issue and four special pleas. In the first and second the averments are that the insured's death "did not result from accidental bodily injuries independently of all other causes." In the third special plea, after setting forth certain statements made in the insured's application, it is averred that at the time of his death he "was not in a sound condition mentally and physically and was subject to fits, disorders of the brain and had bodily and mental infirmity or deformity." In the fourth special plea, after setting forth the provisions as contained in paragraph 21 of the policy, under the heading of "Additional Provisions" (above mentioned), it is averred that the insured "died as the result of sickness and a diseased condition existing prior to the issuance of said policy." Replications to the special pleas were filed.

On the trial, after plaintiff had introduced the policy in evidence, as well as the last "renewal voucher" showing payment and acceptance of premium of $45 for the year ending April 6, 1928, it was stipulated that due notice of the insured's death had been given to defendant and also that due proofs of loss had been made. Thereupon plaintiff testified in her own behalf and she called as witnesses Chris Christensen, an office associate of the insured for several years prior to his death; Drs. Moorehead and Potts, dental sur-

geons, who treated the insured shortly prior to his death; Drs. Koch and Scott, medical experts; and Dr. Oberhelman, who witnessed the post mortem examination of the insured, had at St. Luke's Hospital, Chicago, on July 4, 1927.

Plaintiff's evidence disclosed the following facts in substance: For many years prior to his death, at about 60 years of age, the insured had enjoyed excellent health. On the evening of May 31, 1927, after he had worked as usual during the day, he complained to his wife (plaintiff) of pain in his lower jaw, and at his request she looked at the gums of that jaw but could not see anything that looked wrong. At his further request she sterilized an ordinary sewing needle by putting it in alcohol, and inserted it "perhaps three-eighths of an inch" into that portion of the jaw or gums which he said was the most painful. Nothing, however, came out except a little blood. During the night he complained of increased pain. On the following day he consulted Dr. Moorehead, a dental surgeon, who examined his jaw and also caused an X-ray picture to be taken. The doctor testified that he "found considerable swelling, redness and puffing of the tissues, indicating an *acute* infection," and also found "a small fragment of a tooth root which was imbedded in the tissues" and not exposed to view; that, after making the usual operative preparations, he removed the fragment of the root "which was the seat of the infection"; that when he made the incision prior to such extraction the tissues were swollen and inflamed; that he employed the usual and proper surgical technique in the extraction; that the fragment of the root was "submerged" and not "exposed to view" because the tissues had healed over it; that the operation was a simple one; that on the following Sunday (June 5), being summoned by telephone, he went to the insured's home and gave him further treat-

ment; that he then complained of severe pain in his jaw and neck; and that he did not see him or treat him thereafter. The insured's pain continued to increase and the infection to spread, and about June 7 he was taken to St. Luke's hospital and there treated by Dr. Potts, who testified that he found the patient "had a large swelling on the side of his face, had fever and was septic"; that by septic is meant "poison from pus and infection"; that he saw the necessity for at once opening the "large abcess" on the jaw, and he opened it and put in some tubes and secured drainage; and that he "also opened the sinus which was discharging pus up inside of his mouth." The insured, although receiving further treatment, continued to get worse and finally died at the hospital on July 3, 1927. The post mortem examination revealed "an acute infection of the mandible (lower jaw, right side) with pus formation extending into the soft tissues below the jaw and up along the side of the face, beneath the skin, dissecting its way up beneath the scalp and following through the cranium bones, and . . . extending through the little canals . . . and with an accumulation of pus beneath the brain membrane, giving a so-called localized brain abcess on the right side."

The testimony of plaintiff's medical expert witnesses disclosed that one of the ways an infection can enter healthy tissues and create an acute infection in the mouth is by having the mucous membrane broken by traumatism and thus afford a port of entry for germs; and that this may be brought about in various ways, such as puncturing the gum surface with a needle, biting a sharp crust, injuring the gum surface while cleaning the teeth with a toothpick, irritating the gum surface by plates of a set of false teeth (which it appears the insured wore), or any other cause sufficient to make a break in the mucous membrane. Dr. Summer L. Koch testified in substance that

"infection is in a great majority of cases introduced into the system through an open wound"; that "an open wound may come from a very trivial thing, from a sliver, the puncture of a needle, a scratch, from any puncturing wound that goes into the tissues, anything that carries disease producing bacteria with it"; that "this is the most common method of introducing infection"; and that "germs which might cause the death of a person may be introduced by the introduction of a needle into the jaw." After a question regarding a hypothetical person had been put to the witness and he had answered it, he was further asked if he had an opinion "as to what might or could have caused the infection that caused the death of this hypothetical person?" On defendant's attorney objecting to the question as "invading the province of the jury," the court sustained the objection. The witness further testified that "wounds cause an open seat for infection to set in"; that "it is possible that irritation in a person's mouth, who is wearing false teeth, may cause a wound from which an infection may set in"; that "false teeth may cause wounds just like a sliver or any kind of an instrument"; and that "any type of wound, no matter how it is caused, may be a portal entry for bacteria." On cross-examination he further testified: "A root that is quiescent may lie in a jaw for months or years without giving trouble, and it would be rather unusual for a sudden infection to develop from that source, although it is possible. Where a man has an old root in his jaw which is covered over and develops a severe and *persistent* pain, it might indicate an infection or pressure on a nerve. It is very unusual for infection to be present without making itself felt by *constant* symptoms."

After considering the terms of the policy, plaintiff's evidence and the exhaustive briefs of opposing counsel, in which are cited and discussed many adjudicated

cases in this State and in other states and jurisdic-
tions, we are of the opinion that the trial court erred
in directing a verdict in defendant's favor and in en-
tering the judgment in question. We think that plain-
tiff's evidence disclosed prima facie that the insured
met his death as the direct result, and independently
of all other causes, of having received *accidental* bodi-
ly injuries, and that the cause should have been sub-
mitted to the jury under proper instructions. Our
conclusion is supported, we think, by the holdings and
decisions in the following cases: *United States Mut.
Acc. Ass'n v. Barry,* 131 U. S. 100, 121; *Lewis v. Ocean
Accident, etc., Corp.,* 224 N. Y. 18, 20–21; *Higgins v.
Midland Casualty Co.,* 281 Ill. 431, 437; *Christ v.
Pacific Mut. Life Ins. Co.,* 312 Ill. 525, 535–6; *Schleicher
v. General Accident, Fire & Life Assur. Corp.,* 240 Ill.
App. 247, 252; *Vollrath v. Central Life Ins. Co.,* 243
Ill. App. 181, 187; *Costello v. Federal Life Ins. Co.,*
259 Ill. App. 321, 325–6; *Garrett v. International
Travelers' Ass'n* (Tex. Civ. App.), 14 S. W. (2d) 944,
946. In the *Higgins* case, *supra,* our Supreme Court,
quoting from another case, said: "If in the act which
precedes the injury, though an intentional act, some-
thing unforeseen, unexpected and unusual occurs
which produces the injury, it is accidentally caused."
In the *Christ* case, *supra,* our Supreme Court, quoting
from another case, said: "The intention is, as has
been said, to afford full protection and indemnity to
the assured. Any accident that causes bodily injury
in any way is included. Bodily injury is more com-
monly associated, perhaps, with physical force of some
sort, but in the absence of anything in the policy limit-
ing it to that, we do not see how or why it can or
should be so restricted. A liability growing out of
an accident which results in infecting the workman
with a loathsome and dangerous disease, and thereby
causes him great and perhaps lasting injury, would
seem to be as much within the spirit and intent of the

contract as if the injury had been caused by a blow or some other equally obvious manifestation of force.'' In the *Garrett* case, *supra,* it appeared from plaintiff's evidence that the insured preceding his death had a cold and during this period had rubbed his nose with a handkerchief and had picked at it with his hand; that a pimple and a sore on the nose developed which he rubbed and squeezed so that the nose became raw and chafed and a carbuncular infection developed which spread all over his face and head, from which he died; that there was medical testimony to the effect that such infection could arise only from the introduction of germs from the outside; and that the policy contained a similar provision as to blood poisoning or septicemia as in the present policy. At the conclusion of the plaintiff's evidence the court directed a verdict in favor of the defendant and entered a judgment against the plaintiff. In reversing the judgment and remanding the cause the court said (p. 946):

''The evidence raised the issue as to whether carbuncular infection was present on insured's hands and handkerchief and about his nose at the times above mentioned. The showings above mentioned are not presumptions drawn from presumptions, as contended by appellee, but they are the ultimate facts, drawn as reasonable inferences from a group of facts and circumstances testified to by witnesses. . . . We think the jury might have reasonably found from the evidence that insured infected his nose by rubbing it and picking at it with his hands and handkerchief; and that the carbuncular infection resulted from an external force, to wit, the rubbing and picking of the nose as above mentioned, rather than from natural causes.''

The judgment of the circuit court should be reversed and the cause remanded, and such will be the order.

*Reversed and remanded.*

KERNER and SCANLAN, JJ., concur.