## Amanda L. Prehn, Appellee, v. Metropolitan Life Insurance Company, Appellant.

### Gen. No. 35,786.

Opinion filed June 28, 1932. Rehearing denied July 11, 1932.

HOYNE, O'CONNOR & RUBINKAM, for appellant.

WARD & KREITZER, for appellee; GILBERT O. VOLKE and HARRY K. WARD, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In an action of the first class in assumpsit, commenced on May 8, 1931, and based upon defendant's certificate or policy of accident insurance, there was a trial without a jury in December, 1931, resulting in the court finding the issues for plaintiff, assessing her damages at $1,000, and entering judgment in that sum against defendant. This appeal followed.

In plaintiff's statement of claim she alleged that on December 31, 1924, Fred R. Prehn entered into an

insurance contract (copy attached) with defendant; that all premiums thereon were paid; that the contract provided that in the event that Prehn (the insured) should die as the result of and within 90 days from an accident, defendant would pay to the named beneficiary (plaintiff, wife of insured) the sum of $1,000; that on September 12, 1930, Prehn "got up quickly from a chair in a switch shanty of the Chicago Rapid Transit Co.," located at Desplaines avenue in Forest Park, Illinois; that in so doing he "ruptured his spleen"; that as the result of the accident he died on September 17, 1930 (five days later); that plaintiff as beneficiary is entitled to receive the sum of $1,000; that she has frequently demanded of defendant the payment of said sum; but that defendant has refused and still refuses to pay the same, etc.

It appeared on the trial that defendant had issued a "Group Policy" of accident insurance, covering employees of the Chicago Rapid Transit Co., and also had issued certificates to employees, including the particular certificate, No. 3745, to Prehn on December 31, 1924. By agreement a copy of the Group Policy was introduced in evidence at the same time that plaintiff introduced the original certificate sued upon. The terms, conditions and limitations with respect to the insurance as contained in the Group Policy are substantially the same as mentioned in said certificate, in which on its face it is stated that, subject to the terms and conditions of Group Policy No. 26, Prehn is insured for $1,000, "against the results of bodily injuries sustained while insured under said policy *and caused directly and independently of all other causes by violent and accidental means*, to wit: If such injuries shall, within ninety (90) days from the date of accident, result in any one of the losses named in the following schedule, the Metropolitan Life Insurance Company will pay the amount specified in such schedule."

Then follows the schedule in which it is stated that for "loss of life" the full amount ($1,000) will be paid; and it is further stated that "indemnity for loss of life of the insured is payable to Amanda L. Prehn, beneficiary," and that "certain limitations in said Group Policy are described on the last page hereof," and that "this certificate shall be void if any premiums be not paid when due." On the back or last page of the certificate are stated, among others, the following "limitations":

"This insurance shall not cover . . . accident, injury, death or other loss caused wholly or partly by disease or bodily or mental infirmity or by medical or surgical treatment thereof, or by hernia, ptomaine or by bacterial infection (except only septic infection of and through a visible wound accidentally sustained)."

In defendant's affidavit of merits, sworn to by its authorized agent, one of the mentioned defenses is that due and proper notice and proofs of loss were not given to defendant. On the trial plaintiff's evidence showed the contrary to be the fact and this defense was abandoned by defendant. The only other mentioned defenses in the affidavit are (1): That the insured's death "was not caused as a result of bodily injuries sustained while insured, or caused directly and independently of all other causes *by violent and accidental means,*" and (2) that said death "was *contributed to* or caused by other causes than violent and accidental means."

On the trial plaintiff's witness, E. E. McFadden, testified in substance that during and prior to September, 1930, he was employed by a railroad company at night as a towerman or switch tender, and Prehn as a collector of fares on trains by the Chicago Rapid Transit Co.; that they frequently saw each other in the same cabin or shanty; that both usually worked each night from about midnight until about 6 o'clock

a. m.; that shortly after midnight and early in the morning of September 12, 1930, both were in the shanty and Prehn was waiting for a train to make collections; that it was warm and Prehn was sitting in a chair which was tilted back against the sill of an open window; that the witness called Prehn's attention to the fact that a train was coming and Prehn got up from the chair, "a little faster than a fellow ordinarily would," and walked out of the door; that "he arose by letting all four legs of the chair hit the floor"; that the witness and Prehn were afterwards during the night frequently together in the shanty; that Prehn complained of his back hurting him; that he continued to perform his duties until about 6 o'clock a. m., when he ceased working and left the shanty; and that the witness did not thereafter see him alive.

Plaintiff's witness, Rev. Ira L. Livingston, a Presbyterian minister, living in Forest Park, Illinois, and a friend of Prehn, testified in substance that he had known Prehn for about four years and frequently saw him; that on the morning of Saturday, September 13, 1930, he saw him in bed at his home; that he was apparently suffering intensely; that he "would writhe in bed and put his hand on his back" and at times exclaim "this is terrible"; that prior to this time and during the month of September the witness had seen him four or five times, and noticed nothing unusual in his conduct, and he "appeared to be going about in the usual way"; that prior to this visit he had "never known him to have a sickness"; that, however, "on June 14, 1930," he "fell from a scaffold while painting the church"; that the scaffold was not more than 12 or 14 feet high; that the witness saw him "playing baseball" on an evening about 10 days after his fall from the scaffold; that he appeared vigorous at the time; and that Prehn was a large man and weighed about 225 pounds.

Plaintiff's witness, Dr. Chester W. Trowbridge, a physician and surgeon of extensive experience and who attended Prehn at his home and at the West Suburban Hospital in Oak Park, Illinois, from September 13 until September 17, 1930, when he died, testified in substance that he first saw him in bed at his home; that he complained of severe pains in the "right sacro-iliac region" and other pains in the abdominal region; that he had a normal temperature, a normal pulse and a slight abdominal rigidity; that his pains were so severe that the witness was "almost unable to move him for examination"; that he administered morphine to relieve the pain and gave instructions for treatment by his wife; that on the same evening (September 13) he was again summoned to the home and found the same symptoms; that upon inquiring as to the probable cause, Prehn told him (referring to said morning) that "he had been leaning back in his chair, that in his haste to arise from the chair he had felt a pain in his back, which had increased, and that he had become worried as time went on"; that upon further inquiry Prehn "recited an incident of his falling off a scaffold or ladder while painting a church"; that the witness called twice on the second day in the morning and in the evening; that in the evening Prehn's "temperature had risen to 103 and he was decidedly worse"; that on the following day he was with difficulty removed to the West Suburban Hospital; that thereafter further treatments were had and several other physicians and surgeons connected with the hospital were called in consultation; that examinations were made of the abdominal region to see if there was evidence of acute abdominal disease and X-rays were taken "of the hip and sacro-iliac region to see if there was a fracture and all this was negative"; that, finally, on September 17, "the patient's condition became so serious and his abdomen

so distended that we decided that an explorative operation was imperative''; that the patient ''was semiconscious and a local anaesthetic was given''; that with the assistance of two physicians and internes and nurses, the witness performed an operation; that the patient's abdomen was opened and ''we found a markedly distended bowel which was discolored''; that the patient's condition then ''became so serious and his pulse so bad that we deemed further interference could not be attempted, and I saw that he would die on the table if I continued, so I sewed him up and removed him to his room and he expired about 15 minutes later''; that on the same day, with the permission of Prehn's widow, a post-mortem examination was made by Dr. Piette, the pathologist and director at said hospital; and that the witness together with other physicians were present at the examination. The witness further testified as to said examination ''that the whole internal cavity was opened; that we found a severe hemorrhage in the lesser peritoneal cavity; a peculiar clot about the size of a large grape fruit was removed; *we found a ruptured spleen;* the spleen had a laceration of about 2½ to 3 inches in length; there was a blood clot in it that showed evidence of some degeneration or death of the spleen substance; the capsule or sack of the spleen was also lacerated; there was also *a scar* in the spleen, which I took for granted as evidence of *some prior injury;* the scar was about 1½ inches long and it might be months or years old; the 2½ inches' laceration of the spleen (above mentioned) was, I would say, *two or three days old,* due to the fact that there was a black blood clot in this lacerated area; we made no examination of the sacro-iliac region that I spoke of, because the examination as made satisfied everybody as to the cause of death, and assuming it was *accidental,* I called the coroner's office; prior to that I had no idea what-

soever as to the cause of death; this man was approximately 35 or 36 years of age, was quite fleshy, and weighed perhaps 225 to 230 pounds.''

Dr. Trowbridge further testified that he not only had an opinion as to the cause of Prehn's death but that he *knew* the cause, and that it was ''hemorrhage due to a *ruptured spleen.*'' To a hypothetical question, based upon the testimony of the witnesses McFadden and Livingston and his own observation of the patient, he expressed the opinion that ''the spleen was ruptured as the result of a sudden muscular movement,'' and upon being asked ''whether a sudden or quick rising from this chair could have caused a rupture of the spleen,'' he replied: ''My opinion dates back to his fall off the ladder; I believe that his fall off the ladder caused a *slight* laceration in the spleen underneath the capsule, and that this further exertion on his part *completed the act;* by further exertion I refer to when he arose from the chair.'' He further expressed the opinion that ''the scar that he found on the spleen might have been caused by his falling from the scaffold.'' On cross-examination the witness further testified that he did not examine the spleen after it was removed from the body, but that he was present while it was being examined; that it was abnormally large and had adhesions on it; that an internal viscus can rupture from muscular exertion; that, in answering the hypothetical question and stating that the rupture of the spleen could have been caused by the sudden rising from the chair, he ''took into consideration the other accident which occurred in June, 1930''; that said accident in June ''most assuredly contributed to his condition''; that the direct cause of the lacerated spleen ''was external violence *of recent origin,* i. e., within two or three days.'' On redirect examination the witness further testified that the injury received from the accident in June ''*wouldn't cause his death,* but caused a diseased

spleen and *the additional accident caused his rupture."*

Plaintiff's witness, Dr. Eugene C. Piette, who performed the post-mortem examination, testified at length as to what he then discovered. His testimony is to the same effect as that of Dr. Trowbridge, except that he "did not find any scar on the spleen capsule or within the spleen tissue." He testified in part: "There were some adhesions present in the abdominal cavity unquestionably *of old origin*. As a rule these adhesions are interpreted to be of traumatic origin. The spleen was considerably enlarged and there was a tear or rupture therein over an inch in size." He expressed the opinion from said examination that Prehn's death was caused by "loss of blood into the abdominal cavity caused by the *rupture of the spleen."* In answer to a lengthy hypothetical question he expressed the opinion that the rupture in the spleen that he found upon such examination could have been caused by the hypothetical man being seated in a chair tilted back, and rising quickly, and bringing the chair down on its four legs. On cross-examination he testified that the accident of falling from the scaffold in June, 1930, of which he had heard, "may have left certain changes within his body." On redirect he testified that the only body changes that he found on the post-mortem examination that might be attributable to the scaffold accident were "multiple adhesions in the peritoneal cavity."

Except for one witness called to identify the post-mortem examination record, signed by Dr. Piette and which defendant introduced in evidence, defendant's only evidence was the testimony of Dr. Harry E. Mock, called as an expert witness. Having heard the testimony given in court by Dr. Trowbridge, and having read the transcript of the testimony given by Dr. Piette, Dr. Mock expressed the opinion, in answer to a hypothetical question, that, assuming a *healthy man*

with a *healthy* spleen, "his rising from the chair suddenly could not cause a rupture of the spleen." He then was told to assume the fact that the same individual had fallen from a scaffold about 90 days prior to his rising from this chair, and asked if, in his opinion, "the fall from the scaffold had anything to do with the condition in causing the death?" He replied "I can answer that question only in the light of previous testimony that there were changes in the spleen indicating *an old condition*. . . . There is not enough of the question there for me to answer yes or no. I don't know whether a fall from the scaffold had anything to do with it without assuming certain knowledge that I have." He also expressed the opinion that "the immediate cause of death was undoubtedly surgical shock, plus hemorrhage from a *ruptured spleen*," and that the "ruptured spleen could more probably occur from such movements as moving him to the X-ray room and to the operating room and back."

In urging a reversal of the judgment defendant's counsel contend that Prehn's death did not result from violent and accidental means independently of all other causes, and that the court erred in refusing defendant's motions, made at the close of plaintiff's evidence and at the close of all the evidence, to enter a finding and judgment for defendant. We cannot agree with the contentions. We are of the opinion that the evidence sufficiently showed that Prehn's death did result from such violent and accidental means and independent of other causes as rendered defendant liable under the certificate or policy sued upon, and that the court's finding and judgment are sufficiently sustained by the law. (See *United States Mutual Accident Ass'n v. Barry*, 131 U. S. 100, 121; *Lewis v. Ocean Accident & Guarantee Corp.*, 224 N. Y. 18, 20, 21; *Higgins v. Midland Casualty Co.*, 281 Ill. 431, 435, 437; *Christ v. Pacific Mut. Life Ins. Co.*, 312 Ill. 525, 530, 531; *Vollrath v. Central Life Ins. Co.*, 243 Ill. App. 181,

184, 187; *Hibbs v. United States Fidelity & Guaranty Co.*, 262 Ill. App. 279, 286, 287.) In the *Higgins* case, *supra* (p. 437) our Supreme Court, quoting from another case, said: "The proper and true test, in all instances of voluntary action, is that defined in the *Barry* case (131 U. S. 121). If in the act which precedes the injury, though an intentional act, something unforeseen, unexpected and unusual occurs which produces the injury, it is accidentally caused."

The judgment of the municipal court should be and is affirmed.

*Affirmed.*

KERNER, P. J., and SCANLAN, J., concur.