## Ida Paoli, Appellee, v. Loyal Protection Insurance Company, Appellant.

Opinion filed March 4, 1937.

Leahy, Walther, Hecker & Ely, Lyon Anderson, all of St. Louis, Mo., Felsen & McMurdo and L. H. Degnan, all of East St. Louis, for appellant.

Philip G. Listeman, of East St. Louis, for appellee; James K. Moran, of East St. Louis, of counsel.

Mr. Presiding Justice Stone delivered the opinion of the court.

This is an appeal from a judgment of $1,553.95 in a suit to recover on an accident insurance policy issued by defendant to Guido Paoli, in which policy the plaintiff Ida Paoli was named as beneficiary of the death benefit.

The policy was issued April 21, 1925. The principal sum provided as a death benefit was $1,000 plus an increase of 50 per cent, after the policy should be in force three years. At the time of insured's death, April 18, 1935, the policy had been continuously in force since its issuance, so that by its terms $1,500 was payable in the event of death of insured through accidental means.

The material portions of the policy consisting of the first page and that part of the second page containing signatures of the officers of appellant were attached to the complaint as Exhibit A and were introduced in evidence by the appellee as plaintiff's Exhibits A, A-1, and A-3. The first page of the policy is captioned with this language: "This policy provides indemnity for loss of life, limb, sight or time by accident, to the extent therein provided." On the same page, under the title, "Loss of Life by Accident" the appellant agrees to pay to the beneficiary the principal sum "If the death of the insured occurs while this contract is in force, as a result of, and within ninety (90) days after an occurrence of, an injury causing total disability immediately and continuously until death."

Those parts of the policy that were not introduced by appellee were introduced by appellant as defendant's Exhibit 4. In paragraph 4 of appellant's Exhibit 4 it is provided that in the event of accidental death, immediate notice thereof must be given to the company.

Section A of defendant's Exhibit 4, under the heading "General Conditions and Provisions" provides "Indemnity shall not be payable for injury unless same be the result of external, violent and accidental means, leaving upon the body external marks of contusion or wound visible to the eye and unless same be independent of all other causes, and not wholly or

partly, directly or indirectly, the result of disease."
It is this provision that appellant contends requires
proof that the insured's death was occasioned by ac-
cidental means before a recovery in favor of the plain-
tiff can be sustained. Appellee contends that it only
applies to a bodily injury causing disability and does
not apply to the loss of life by accident.

The uncontradicted proof shows that Guido Paoli,
the insured, at the time of his death was 40 years of
age; that he was married and had lived with his wife
and family in the city of Collinsville, Illinois, for 14
years prior thereto. He was five feet tall, weighed 167
pounds, and was a strong, healthy, well-nourished and
robust person, accustomed to performing hard labor.
He began working at a coal mine at the age of 13
years. For many years prior to his death he earned
his livelihood by means of hard, common, manual
labor. He was not known to have been sick or ill at
any time. During the war he served overseas in the
United States Army. For some time prior to the 30th
day of March, 1935, he had been building an addition
to his home, and did all of the concrete work and
manual labor thereon. On that day he arose about 5
o'clock a. m., went into his yard and worked until
around 7 o'clock; then he had breakfast with his wife.
At the time he appeared to be in the same state of good
health that he had always been. At breakfast he
carried on a normal conversation. At about 7:30
o'clock that morning he took a wheelbarrow that
weighed about 50 pounds and started to a lumber yard
that was in the same block, immediately west of his
residence. He pushed the wheelbarrow west along
the sidewalk, and when he reached the house of Dan
Gansner, a neighbor, he was called to the place where
said Gansner was working, and they carried on a con-
versation. This neighbor had known the deceased for
12 years, and he said that he noticed nothing wrong

with him physically, and that he carried on a normal conversation with him. After conversing with Mr. Gansner for a few minutes deceased again started on his way toward the lumber yard, pushing his wheelbarrow until he came to a grocery store operated by Otto Schreiber. Here he stopped for a few minutes and talked with Mr. Schreiber, who had known him for 14 or 15 years. Mr. Schreiber testified that the deceased appeared to be in good health and talked friendly as usual, and that when they concluded their chat the deceased proceeded to the lumber yard, which was between 100 and 150 feet west of Mr. Schreiber's store; that he walked in the same manner as the witness had seen him walk for a number of years prior thereto. Upon reaching the lumber yard, the deceased went into the office and asked the manager for a sack of cement, and he was instructed to push his wheelbarrow to a loading dock which was approximately 100 feet south of the entrance of the yard.

The cement was kept at a loading dock in sacks about 30 inches long and weighing 95 pounds. The deceased placed his wheelbarrow parallel with the loading dock, facing the north, and about 18 inches from the west side of the dock. The floor of the dock was approximately three and one-half feet from the ground. He was facing the north and was standing between the dock and his wheelbarrow and he turned to the east, took hold of the sack of cement with both hands, and started to lift it from the loading dock to the wheelbarrow. When he had the sack of cement elevated above the wheelbarrow, he dropped it, fell or leaned against the west wall of the dock, and took a few steps and fell down. He was unable to arise and an automobile was driven to where he was lying and two men assisted him into the automobile. At that time he was unable to use his legs. He was seated on the floor of the automobile and taken to a doctor, who

administered a hypodermic injection. From the doctor's office he was taken to his home, arriving there about 8:30 a. m. Mr. Gansner, the neighbor with whom he had talked that morning, came to the automobile and assisted him into the house. He could not use his legs and was pale. He was placed in bed and became semiconscious and remained in that condition until he arrived at the Jefferson Barracks Hospital in St. Louis, between 2 and 3 o'clock that afternoon.

Upon being admitted to the hospital he stated that while attempting to lift a sack of cement, he fell to the ground and was unable to arise; that later he lost consciousness for approximately 15 minutes, and was told that he frothed at the mouth.

The evidence shows that while he was in the hospital he remained in bed, was conscious at times and was able to talk and walk at times. Tests made of his heart, lungs, eyes, ears, bladder, liver and nose showed that there were no defects in any of those organs. His temperature and pulse readings were normal. On April 15, 1935, his temperature began to rise and his pulse increased. From a normal reading of 20/20 on April 5, 1935, his temperature began to rise and his pulse increased. From a normal reading of 20/20 on April 5, 1935, the vision of both eyes was reduced to 20/200 on April 18, 1935, which the doctor said was approaching blindness. He gradually grew worse until he was unable to see at all, and fell into a coma and died on April 18, 1935.

A post mortem examination disclosed an abscess of the brain. It was admitted that his death was occasioned by reason of that abscess.

Appellee produced Dr. Francis M. Barnes, Jr., who qualified as an expert in mental and nervous diseases and brain injuries. He testified that the insured died from an abscess of the brain; that this abscess, in his opinion, began about April 14th or 15th, when the hos-

pital records showed that the deceased had a high temperature and his pulse was above normal, and his vision was greatly reduced. Dr. Barnes testified that, in his opinion, at the time the deceased lifted the sack of cement, there was an alteration or impairment in the circulation of the blood supply to the brain, caused either by a small hemorrhage or the break or rupture of a blood vessel in the brain, and that this condition resulted in a thrombosis; that the thrombosis comprised the seat for an infection which later developed, causing the abscess in the brain. He said that lifting the sack of cement in the manner described would or could have been sufficient to produce a hemorrhage or rupture of a blood vessel in the deceased's brain. He said that from the evidence contained in the hospital reports the deceased had no other condition or infirmity which could be the cause of death.

Appellant offered no testimony, but at the close of all the evidence moved to instruct the jury to find the issues for the defendant, contending that there was no evidence that the death of the insured was caused through external, violent and accidental means; that, therefore, there was no liability. It also contended and contends here that in order for the jury to find that the alleged strain caused insured's death it was necessary to pile inference upon inference; and that there is no substantial evidence that the alleged strain did cause the abscess from which the insured died.

It is claimed by appellee that each of these assignments of error is fully met by the evidence in the record and the law applying thereto.

In appellant's claim that the evidence does not warrant a verdict that defendant came to his death by accidental means and that under the evidence in the case the court should so have instructed the jury, many cases are cited, notably the case of *United States Mut. Accident Ass'n v. Barry,* 131 U. S. 100, 9 Sup. Ct. 755, 33 L. Ed. 60.

In the *Barry* case the deceased with two other physicians was undertaking to take the short way around to reach a certain destination. This necessitated jumping from a small platform to the ground. The deceased was a doctor of the age of 30 years and was in company with two other physicians. The other two jumped from the platform safely and the deceased jumped and lit in some way to attract the attention of the other doctors. He stated he thought that he was not hurt, but serious injuries followed the incident, from which deceased died. It was there contended that there was no evidence of accidental means which brought about the injury and subsequent death of deceased. The Supreme Court of the United States in affirming the decision gave a definition to the words "accidental means" in approving the charge of the trial court, which has become almost universally the definition adopted by the courts of the land. The court used this language: "It is further urged that there was no evidence to support the verdict, because no accident was shown. We do not concur in this view. The two companions of the deceased jumped from the same platform at the same time and place and alighted safely. It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were on all the evidence at liberty to say that it was an accident that he did not." That seems to us a perfect parallel for the case at bar. It must be presumed that the deceased in this case intended to lift the sack of cement without injury to himself and that he thought he would. If there was more evidence of an unforeseen event entering into the injury of the deceased in the *Barry* case than in the case at bar we are unable to discern it. The jump and the alighting was the cause of the injury in the *Barry* case, if there was an injury. It seems to us equally plain that the lifting of the sack of cement in the case at bar was the cause of the injury, if there

was an injury. How could the deceased in the *Barry* case have injured himself in that jump? He did the thing he started out to do, and so far as the evidence shows, did it in the way he intended to do it, and some unforeseen thing entered into it. Perhaps he lit on his heels; maybe his legs were held unduly stiff. Nobody knows from the record just what happened. In the case at bar the man intended, of course, to lift and place in his wheelbarrow the sack of cement. Perhaps he was standing in a position a little different from what would have been safe; perhaps the sack of cement turned out to be heavier than he anticipated and, consequently, the lift larger. We have about the same amount of intelligence in one of these incidents as the other.

The court further held in the *Barry* case, *supra,* that "the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was whether there was anything accidental, unforeseen, involuntary, unexpected in the act of jumping from the time the deceased left the platform until he alighted on the ground; that the term 'accident' was used in the policy in its ordinary popular sense as meaning happening by chance." In the case at bar the court instructed the jury that in order for the plaintiff to recover he must prove by a preponderance of the evidence that his deceased, the insured, came to his death as the result of external, violent and accidental means independent of all other causes. The issue was thereby placed before the jury, it seems to us, just as definitely and with the same duty and responsibility as was true in the *Barry* case, *supra.*

The court further said in the *Barry* case,—and this appellant is relying upon,—"that if a result is such as follows from ordinary means voluntarily employed, in a not unusual or unexpected way, it cannot be called

a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means.'' Adopting this definition as the standard, as the courts of the country have done, we are unable to accept appellant's contention that a peremptory instruction was proper in this case, in view of the verdict and judgment that was upheld in the *Barry* case.

Illustrations might be multiplied, but we cannot divorce ourselves from the conclusion that the facts in the two cases are so similar that they must be controlled by the same principles. The deceased in this case was a strong, healthy man, accustomed to hard work and outdoor life. He was well and hearty on that particular day; he was at his usual work; he was in his usual mood. There was nothing to indicate anything but a sound, healthy physical body. He undertook to remove this sack of cement. When he lifted it, or attempted to lift it or slide it, he gave way; his legs went from under him; he became paralyzed.

The jury must decide, as they did decide, whether what happened there was the result of accidental means in view of the law as the court laid it down to the jury in its instructions, following the same principle as in the *Barry* case.

We are unable to distinguish any substantial difference in the two sets of facts and the two sets of instructions given to the respective juries, and certainly not to the extent that in the *Barry* case a verdict for accidental death should be upheld by the Supreme Court of the United States and in this case it should be held by us as a matter of law that the deceased did not receive his injuries through accidental means.

While the *Barry* case, *supra,* is perhaps the leading case in this country on this particular subject, it does

not stand alone. There is a wealth of illustrations in the decisions of the courts of our own State in which recovery has been sustained on the character of policy here involved in harmony with the rule announced in the *Barry* case. *Higgins v. Midland Casualty Co.*, 281 Ill. 431; *Christ v. Pacific Mut. Life Ins. Co.*, 312 Ill. 525; *Prehn v. Metropolitan Life Ins. Co.*, 267 Ill. App. 190; *Hibbs v. United States Fidelity & Guaranty Co.*, 262 Ill. App. 279. Indeed what might seem at first blush to be disharmony in the decisions of our courts in cases of this character will be found to be differences in states of fact rather than in the application of principles of law.

It is next urged by appellant that in order for the jury to have arrived at its verdict it must do so by piling inference upon inference. We cannot agree with that contention, either by reason of the authorities cited or by the particular facts shown by the evidence in this case. In the case of *Burns v. Prudential Ins. Co. of America,* 283 Ill. App. 442, that question was raised under a state of facts which seems to us would be equally, if not more, susceptible of the application of that rule than in the case at bar. The court there said, "There is no such rule; nor can be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it; and from this we infer that it was his bullet which struck and killed the deceased. . . . In these and innumerable daily instances we build up inference upon inference and yet no court ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials, proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon."

A similar rule was laid down in *Devine v. Delano.* 272 Ill. 166, and again in *Ohio Bldg. Safety Vault Co. v. Industrial Board,* 277 Ill. 96.

But in this case it was not necessary for the jury to infer that the deceased sustained a strain by lifting a sack of cement, and that that strain caused the bursting of a blood vessel in his brain, which later produced a brain condition which subsequently caused an abscess in the brain, producing death. These matters are all shown by direct evidence in the record and by the legitimate inferences properly drawn from that evidence. It is shown without contradiction that the insured, who had always enjoyed good health and who was a strong and robust person, while attempting to lift a sack of cement suffered some impairment to the blood vessels of his brain. He suddenly fell and became paralyzed and unable to walk. He was immediately taken to a doctor, his paralysis persisted, and then within the course of a few hours he was conveyed from his home to a hospital, where he remained for 18 days in a state of almost constant, total disability. During the time that he was confined in the hospital, the evidence shows that his temperature gradually but constantly increased. The same condition was true with reference to his pulse. His sight was impaired from a normal vision on the 5th day of April to almost total blindness on the date of his death. An expert on diseases of the brain and nervous system testified, without contradiction, that the strain imposed upon the insured's body was sufficient to cause a blood vessel in his brain to burst, and gave it as his opinion that that is what occurred in this case. He also testified, using the hospital records as a foundation, that this condition progressed from that day until the time of his death, and that about the 14th or 15th of April the brain abscess began to develop, as indicated by the changes in temperature and eye vision. The record is void of any evidence or

any suggestion of any other cause or condition that might have caused his death. The evidence shows a complete chain of circumstances from the time insured left his home on that morning until the hour of his death. There is no intervention of time unaccounted for, and the jury was warranted in view of the facts proved and in the absence of any testimony as to any other cause of his death, to infer that the disability he sustained in attempting to lift the sack of cement in question was the proximate, sole and only cause of his death. Appellant has advanced no other theory. Appellee's theory seems to be the reasonable and logical one.

What has been said above, we think disposes of appellant's final contention that the evidence, on the whole, did not warrant the court in submitting this case to the jury. To have taken this case from the jury would have been to ignore a chain of facts and circumstances which strongly tended to prove appellee's case. In fact the facts and circumstances of the case tended so strongly to establish appellee's case, that we do not feel that we would be justified in disturbing the jury's verdict, much less to hold that the trial court erred in submitting the case to the jury.

We find no reversible error in this record. The judgment of the city court is affirmed.

*Judgment affirmed.*