## NEW AMSTERDAM CASUALTY CO. v. BRESCHINI.

### No. 6993.

Circuit Court of Appeals, Ninth Circuit.
May 1, 1933.

Joe G. Sweet and Hadsell, Sweet & Ingalls, all of San Francisco, Cal., for appellant.

Chas. B. Rosendale and Edson G. Thomas, both of Salinas, Cal., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

WILBUR, Circuit Judge.

The appellant, New Amsterdam Casualty Company, hereinafter called the "casualty company," issued an accident insurance policy on June 13, 1913, to John Breschini, hereinafter called the "insured." The policy was renewed from year to year. The insured died July 7, 1930, while the policy was still in force. His wife, Tranquilla Breschini, the appellee, was the beneficiary named in the policy in the event of his death by accident. The appellee alleged that the death of said Breschini was caused by and resulted from bodily injuries "not intentionally self-inflicted, which independently of all other causes were effected solely and exclusively by accidental means resulting within ninety days of the event causing such bodily injuries."

The casualty company claims that the injuries from which the insured died were intentionally self-inflicted in an effort to commit suicide. The policy does not cover death by suicide, whether the assured be sane or insane. The policy expressly covers death caused or contributed to by somnambulism. The complaint did not allege that the death of the insured was contributed to by somnambulism, nor was that subject presented during the trial by the attorneys nor testified to by the witnesses, nor in any way mentioned until raised by the jury, as hereinafter stated.

The facts are undisputed. There is no conflict in the testimony of the witnesses. The only factual question in the case is as to the inferences to be drawn from the uncontradicted testimony. On July 6, 1930, the insured was taken from his home by his adult son, with his consent, and placed in the Murphy Hospital at Salinas, Cal. There he was given a corner room on the third floor. This room opened into a hallway, which in turn opened upon a balcony from which the insured fell, receiving injuries which resulted in his death. The balcony was surrounded by a wooden railing 31½ inches above the floor. The railing was supported by posts at the ends and corners, and the area between the railing and the floor was entirely closed by ornamental woodwork except for a small space 2 or 3 inches wide. Above the top of the wooden railing is an iron railing parallel thereto and distant 21 inches, supported by iron stanchions secured to the posts. The iron railing was thus 4 feet 4½ inches above the floor of the balcony, with open spaces 21 inches high and six feet long between it and the wooden railing. The next day the insured crawled through this space and dropped to the ground, which was 20 feet 7½ inches below the floor of the balcony.

Helen Dougherty, a nurse, who was directly across the street from the Murphy Hospital about 11 a. m. July 7, when the insured fell from the balcony, testified that she saw the insured, dressed in his nightgown, come out of the door leading from the hallway onto the porch; that immediately he walked over to the railing and crawled through the railing; that while he did so he hung onto one of the iron stanchions supporting the top railing, or to the iron top railing; that "he got through the railing around the porch, then he let go of the rod [indicating stanchion], and he just went, that is all." She further testified that she saw him fall and strike the ground, partly on the pavement. In response to the court's question, "I suppose he opened the door and walked over and crawled through and dropped, is that the way it happened?" the witness answered, "Yes." As a result of the fall the insured received injuries from which he died a few hours later.

The evidence as to the physical and mental condition of the insured at the time he dropped from the porch to the ground is meager, no doubt because the parties deemed it immaterial. The son stated that in his opinion his father was not ill on July 6 when he removed him to the hospital; that he visited his father, who lived on a farm, and concluded from the way he moved his hands about that he was nervous and that this nervousness was the result of confusion in the house due to several visitors therein and to three or four small children playing in an adjoining room; that because of this nervousness he suggested going to the hospital in Salinas; and that his father immediately acquiesced in the suggestion. When they arrived there the son attempted to get a special nurse for his father, but testified that he did

this merely as a matter of convenience and that the only reason he did not take his father to a hotel instead of the hospital was because it did not occur to him to do so. The son remained with the insured until 9:30 or 10 p. m. July 6.

Dr. Parker, the family physician, was called to the hospital between 6 and 7 o'clock on the evening of July 6 and found the insured in bed and talked with him for about half an hour. The doctor testified that the insured "merely stated that he felt nervous and he thought if he went away from home and stayed a night or two he could rest up there," and that he gave him a sedative to quiet his nerves. Probably because it was considered unimportant, it is not altogether clear from the doctor's evidence whether this sedative was given in the evening of July 6 so that the insured could sleep that night, or whether it was given the next morning when he visited the patient, although a reasonable construction of his testimony is that the sedative was given him in the evening of July 6 when it was contemplated that the insured would remain over night and not the next morning when the physician saw him between 8 and 9 o'clock. At that time the insured stated that he felt able to go home and wanted to do so. However, the doctor advised him to wait a little longer. This was because he wanted to consult with the rest of the family to see whether or not it would be wise for the insured to go home. The doctor stated he was not particularly sick at all. He visited with him for about 20 minutes and left about 9 o'clock.

The son testified that he saw the insured on the morning of July 7 about 9:15 or 9:30, and that he remained with him a half to three-quarters of an hour; that he found the insured very quiet and resting, lying in bed; that he discussed with him his attempt to secure a night nurse the night before; that his father told him he had no need of a nurse, did not think it necessary at all. The witness testified that he left at 10 o'clock and that his father was then asleep. He next saw him after the fall from the porch which had occurred an hour after he left. He testified, over appellant's objection, that while the doctor was out of the room he had a conversation with his father in which his father asked, "What happened to me, where did I go?" Appellant took an exception to the overruling of its objection, assigned the ruling as error, but the assignment is not discussed in the briefs.

A motion for directed verdict was made by the appellant and denied. The court instructed the jury that if the insured committed suicide, or if he intentionally jumped from the balcony of the hospital, or if he was caused to jump by insanity, the verdict must be for the defendant. The jury retired for deliberation at 2:55 p. m. and at 3:52 p. m. returned into court where it appeared that one of the jurors had requested the court to answer the following question: "If a person is hurt while walking in his sleep produced either naturally or induced by a sedative, is he considered accidentally injured?" In reply to this the court read to the jury a provision of the policy to the effect that it did not exclude from the injuries insured against injury resulting from somnambulism, and then instructed the jury as follows: "I therefore instruct you that if you find from the evidence that the death of the assured, John Breschini, was caused by or contributed to wholly or partly, directly or indirectly, by somnambulism, then you must render a verdict in favor of the plaintiff." The defendant thereupon excepted to this instruction on the ground that there was no evidence of somnambulism in the case, and that there was no evidence upon which to base an instruction to the jury upon that subject, and assigns as error the giving of the instruction.

The evidence is clear and undisputed that unless he were sleepwalking the insured intentionally climbed out through an opening in the railing and dropped to the ground, and thus committed suicide. Under the terms of the policy the appellee could not recover in case of suicide whether he was then sane or insane, as the trial court properly instructed the jury. There is not the slightest indication in the testimony that the insured had ever theretofore suffered from somnambulism. The appellee contends, however, that there was substantial evidence of a condition of somnambulism to go to the jury. In support of this contention she cites the testimony of the son that his father was asleep when he left him about one hour before the injury, and of the physician that the insured had been given a sedative although the time it was given, the nature of the sedative, and its probable effect upon the patient, are not disclosed by the testimony; also the son's testimony that the father, after his injury, as above stated, had asked him what had happened. While the point is not urged in the brief on appeal, it is clear that the question asked by the father could not be considered as implying that at the time of the accident he did not know what he was doing and that he was therefore sleepwalking. It showed only that at the time he asked the

question, which was immaterial, he was either in a dazed condition or had then no memory of the events; in either aspect it should have been stricken out. According to the testimony of the physician, he was suffering at the time of the question from fracture of the skull and concussion of the brain and, contrary to the said testimony, was unconscious. The testimony that he was asleep at 10 o'clock, and that at some time he had taken some prescribed sedative, is no substantial evidence of somnambulism, such as justified submitting that issue to the jury. The motion for directed verdict on behalf of the defendant should have been granted.

█ There were numerous instructions upon the question of burden of proof and upon the presumption of accident in the case of unexplained injury. They are not applicable to a fully explained injury and should not have been given. See United States F. & G. Co. v. Blum (C. C. A.) 270 F. 946.

In view of the fact that the events leading to the death of the insured are fully disclosed by the evidence, the inference which might otherwise arise from the unexplained fact of death had been overcome and there is no presumption remaining in the case to be rebutted by testimony. The presumption or inference does not apply in such case. See United States F. & G. Co. v. Blum (C. C. A.) 270 F. 946, supra.

The trial court correctly instructed the jury that if the insured committed suicide, or if his death were caused by intentionally jumping from the balcony of the hospital, or if he were caused to jump by reason of insanity caused by disease or illness, the verdict should be for the defendant, but upon the subject of burden of proof the instruction was that suicide, self-destruction, intentionally inflicted injuries, illness, and disease were affirmative defenses set up by the defendant and the burden was upon the defendant to establish these defenses by a preponderance of the evidence. In this the court was in error.

Upon a new trial, if no additional testimony supporting the inference of somnambulism is introduced and no different testimony in regard to the way in which the deceased met his death is introduced, the trial court should direct a verdict in favor of the defendant.

Judgment reversed, and case remanded to the District Court for further proceedings not inconsistent with this opinion.