Johanna Rebenstorf, Appellee, v. Metropolitan Life Insurance Company, Appellant.

Gen. No. 40,167.

72

Opinion filed February 14, 1939.

HOYNE, O'CONNOR & RUBINKAM, of Chicago, for appellant; NATHANIEL RUBINKAM and WILLIAM S. ALLEN, of Chicago, of counsel.

McKENNA & HARRIS and I. W. KAUFMAN, all of Chicago, for appellee; JAMES J. McKENNA and BURRELL J. CRAMER, of Chicago, of counsel.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This appeal seeks to reverse a judgment for $5,000 entered against defendant, Metropolitan Life Insurance Company, on the verdict of a jury in an action brought by plaintiff, Johanna Rebenstorf (now Johanna Lutz) upon a policy of accident insurance issued by defendant to her husband Paul F. Rebenstorf, in which she was named beneficiary.

Plaintiff's amended complaint alleged the issuance of the policy and the death of Rebenstorf on April 3, 1935; and that on December 25, 1934, he "sustained bodily injuries which were caused directly and independently of all other causes by violent and accidental means, from which bodily injuries said Paul F. Rebenstorf subsequently . . . died." Plaintiff filed the following amendment to her amended complaint: "That . . . on the 25th day of December, 1934, the said Paul F. Rebenstorf sustained certain bodily injuries, which were caused directly and independently of all other causes, by violent and accidental means, which such injuries, directly and independently of all other causes, wholly and continuously disabled and prevented the said Paul F. Rebenstorf from performing any and every kind of duty pertaining to his occupation, and thereafter, during the period of such total and continuous disability, and within two hundred weeks from the date of said accident, i. e., on the 3rd day of April, 1935, said injuries, directly and independently of all other causes, resulted in the death of said Paul F. Rebenstorf."

Defendant's answer, after admitting the issuance of the policy and the death of Rebenstorf, denied that "the injuries alleged to have been sustained by the said Paul F. Rebenstorf on December 25, 1934, wholly and continuously disabled the said Paul F. Rebenstorf and . . . that said alleged injuries prevented the said

Paul F. Rebenstorf from performing any and every kind of duty pertaining to his occupation from December 25, 1934, until the date of his death" and further denied that "the death of the said Paul F. Rebenstorf was caused by said alleged injuries directly and independently of all other causes and . . . that it is liable to the plaintiff in the sum of $5,000 . . . or any other amount whatsoever."

Johanna Lutz, plaintiff, testified that after dinner on Christmas day, 1934, her then husband, Paul F. Rebenstorf, took her, her daughter and her father and mother for an automobile ride; that as he drove east on Dempster road "there was a lady driving a big car going west, and she skidded, lost control of her car and skidded all the way across the road, and hit us . . . it was not right head-on, it was to the left, right at the driver's wheel, hit us there, and then she turned around her car, swing around, and she hit us again in the back, right at the left side in the back of the car where my mother was sitting"; that after the impact our car stopped immediately and "was junked right there"; that "my husband and myself were taken by the Niles Center Police to the police station, from which we were taken home by neighbors"; that after the accident and while they were at the police station her husband "just doubled up" with pain and when they got home "he had to lie down, he was feeling bad"; that she then telephoned Dr. Herpe and went to his office where the doctor "examined him and taped him . . . about between the chest and the abdomen"; that the doctor "put the tape," where the steering wheel hit him; that after the doctor treated her husband they went home in a taxicab; that prior to the time of the accident her husband was in apparent good health; that he had his tonsils removed in the spring of 1934, but had no serious illness during the five years previous to the accident; that, upon reaching home

after their visit to Dr. Herpe's office, her husband went to bed, where he remained for about a week, and "then he tried to get up, to sit in a lounging chair right near the bedroom door"; that Dr. Herpe continued to treat her husband; that during the period following the accident, he complained a great deal about his condition; that he moved around the house "just from the bed to the chair, to the bathroom and back to the bed and back to the chair," and that from the time of the accident until the time of his death he did no work of any kind around the house.

She further testified that at the time of the accident and prior thereto, her husband worked for the Red Cross Spaghetti and Macaroni Company as a salesman on a commission basis and as such salesman used an automobile; that about a month after the accident, he "tried to go back to work"; that he left home one morning about 11 or 12 o'clock and "was back within an hour or an hour and a half"; that she went with him on that occasion and he did not get out of the car; that she turned the car around and drove home; that when they reached their home her husband went to bed; that from that time until his death, he did not "undertake to go back to work"; that her husband was operated upon April 1, 1935, and died April 3, 1935; that at the time of the accident Rebenstorf weighed about 210 pounds and at the time of his death he weighed approximately 180 pounds; that as time elapsed after the accident he became apparently worse and "he lost weight and looked yellow in his face"; and that he got out of bed less frequently and for a period of time before his operation he remained in bed continuously.

Plaintiff testified upon cross-examination that in addition to the time that her husband tried to go back to work "he just reported Friday nights" at his employer's place of business; that he did no work for his

employer during the months of February and March, 1935; and that such compensation as was paid him for those months was either for orders he had sold prior to the accident or for orders which she secured from some of his regular customers and transmitted in her husband's name to his employer. At one point during her cross-examination, upon being asked "Now, isn't it a fact that your husband worked from February to March of 1935, for the same concern, doing the same work?" and the witness answered, "Yes." Further examination of the witness demonstrated that when she answered said question affirmatively, she was confused and did not understand the import of the question.

Dr. Gustav G. Herpe testified that he first attended Rebenstorf in 1933 when he removed his tonsils; that "at that time I found nothing abnormal" upon a cursory examination; that on Christmas day, 1934, "I made a rather complete examination, he having been in an accident . . . at the time I saw him he complained of having been struck on the right side of the chest . . . and he complained of severe pain over the area of the fourth, fifth and sixth ribs on the right side, in about the middle of the clavicle line, that is, in the mid-right side . . . his breathing at that time was very shallow and the man had the facies and expression of a man who was really in quite a bit of pain and discomfort"; that "at that time I strapped up his chest, sent him to bed and gave him some sedatives"; that "I saw him daily, then, until he came into the office . . . I think it was four or five days later when he returned to the office for an X-ray"; that when he saw Rebenstorf at his home during the four or five days mentioned "he was in bed"; that "at that time we continued to leave his chest strapped and gave him sedatives . . . he was a little more comfortable as long as he took the sedatives although his breathing did not

improve for quite some time"; that in his opinion
Rebenstorf continued to suffer pain; that when he
came to the office of the witness four or five days after
the accident "we fluoroscoped him and X-rayed his
chest . . . at that time we found no fractured bones,
but it did seem that there was a tearing of what we
called the costal margins where ribs and cartilages
come together"; that he taped him again and "sent
him back to bed and prescribed absolute rest, with
sedatives, free cauterization, etc.," and that from that
time on "I saw him very often, every day or two or
three, just depending on how comfortable he was";
that from the time he X-rayed him in his office until he
went to the hospital to be operated upon, the pain in
his right side continued, "not always as severe, but
depending mostly upon the amount of sedative, medi-
cation"; that in his opinion Rebenstorf was physically
unable from the day of the accident "to carry on the
duties of driving a car and soliciting customers"; that
"up to . . . February fourteenth, there were no symp-
toms at any time to indicate any pathological condi-
tion, any abnormal condition in the abdominal organs
. . . he complained of no indigestion or otherwise
acute condition in the gall bladder, or of gas, intes-
tinal disorder . . . but at that time he began to com-
plain to me of abdominal distress, and we treated him
from the fourteenth of February up to the latter part
of March before we decided or thought that an opera-
tion was necessary . . . we thought probably medical
treatment would cause the whole thing to subside . . .
we put him on a fat free diet, which they do in gall
bladder conditions . . . we try to thin the bile by
giving the bile salts and certain medications, we try
to offset the gall bladder and liver condition by keep-
ing them on a restrictive diet and absolute rest, as near
absolute rest as we possibly can"; that he had "a sus-
picion of gall bladder difficulty about that time"; that

"he did not respond at all to the treatment given him"; that the witness then determined that an operation was necessary and Rebenstorf was taken to the Lake View Hospital on March 31, 1935; that he operated upon him the next day, April 1, 1935, and when it was found that his gall bladder was in such condition that it could not again function normally, same was removed; that in his opinion Rebenstorf's gall bladder had not "functioned for a number of years, because the gall bladder was filled with stones, and there was no bile in the gall bladder at all, some old fetid material that may have laid there for many months or years, but the gall bladder was not functioning . . . there was not a drop of bile in it at that time"; that it was possible for Rebenstorf "to have lived without his gall bladder definitely functioning for that period of time"; that "the gall bladder is an organ which simply acts as a reservoir to collect bile in between meals, but empties, usually, when it is stimulated by the intake or food or intestinal secretions . . . but there is a double duct, one leading from the liver, and one leading from the gall bladder, into this same common duct, which then empties into the duodenum and supplies the bile, so that the gall bladder may be completely obstructed, and yet you may have a perfectly normal bladder function . . . the duodenum is part of the intestine . . . leading from the stomach, into which the bile empties . . . that is where the digestion of food begins"; that Rebenstorf died April 3, 1935, the third day after the operation; that he assisted in the "post mortem on the body"; that in his opinion "the direct cause of the man's death, in layman's terms, was a heart failure"; that "the trauma precipitated an acute acerbation of the gall bladder condition for which I had to operate, which in turn caused the strain and stress upon the heart, which produced his heart failure and death."

On cross-examination Dr. Herpe testified that upon the autopsy he found a chronic condition of the heart of some considerable standing; that there "was a fatty condition of the heart . . . probably of a number of years standing"; that the condition found in the gall bladder "was chronic" and may have existed "from ten to twenty years"; that the accident could not have been the beginning of this condition; that gall stones take many years to form; that the existence of gall stones is a diseased condition; that in his opinion "myocarditis, the chronic myocarditis or condition of the heart" which he found, was not caused by the accident but was in existence prior to same, that the operation for the gall bladder condition would have been successful if it had not been for the chronic heart disease from which Rebenstorf was suffering, and that he died from natural causes; and that "the operation was for a chronic condition of the gall bladder."

Dr. B. M. Johnson testified in defendant's behalf that he "performed the autopsy on the body of the deceased [Rebenstorf]" whose death had recently occurred following a surgical operation for the removal of his gall bladder; that the heart, lungs and kidneys were examined and there were no findings of any importance as to the lungs; that there was a dilatation of the heart chamber and degenerative changes in the heart muscle; that some of the changes were of recent origin and others were chronic; that the degenerative changes in the heart were of long standing; that there "were stones found in the gall bladder and also an inflammation of the gall bladder wall of more or less long standing . . . not very acute, probably years"; and that the chronic changes.in the heart were of long standing, "a matter of years."

Dr. Herman Roy Johnson, called by defendant as a witness, testified that he was an interne at the Lake View Hospital at the time the operation was performed

on Rebenstorf; that he recorded as part of Rebenstorf's hospital record his history and the history of the operation performed upon him; that his case history sheet reads as follows: "He states his first serious attack of abdominal pain was about twenty years and since then has had several severe attacks of pain. No nausea or . . . vomitting occurred. Recent sickness began six weeks ago and has been seized with these attacks fairly often since then. The pain begins right subcostal area up to right shoulder and around to the back."

James Paul Canepa, also called as a witness by defendant, after stating that he was treasurer and vice president of the John P. Canepa Company, manufacturer of Red Cross Macaroni, Rebenstorf's employer, testified substantially from his records that same showed commissions paid to Rebenstorf and expenses paid for his automobile, amounting to $175.99 for February, 1935, and $259.65 for March, 1935; and that he saw Rebenstorf once a week during said months, when he reported at the company's office.

Defendant contends that "the trial court erred in denying the motion made by the defendant at the close of all the evidence to instruct the jury to find the issues for the defendant, since the evidence conclusively shows that Paul F. Rebenstorf did not die as a result of bodily injuries sustained by violent and accidental means, directly and independently of all other causes, but that his death was the result of disease or bodily infirmity or surgical treatment therefor, risks expressly excluded in the policy, and also because the plaintiff failed to prove that Paul F. Rebenstorf was wholly and continuously disabled as required by the terms of the policy."

Under the terms of the policy in issue, it was incumbent upon plaintiff to prove:

"1. A bodily injury caused directly and independently of all other causes by violent and accidental means.

"2. That such injury, directly and independently of all other causes, did, from the date of the accident, wholly and continuously disable and prevent the insured from performing any and every kind of duty pertaining to his occupation.

"3. That death occurred within 200 weeks from the date of the accident and as a result of such injuries, directly and independently of all other causes."

It is undisputed that Rebenstorf's death occurred within 200 weeks from the date of the accident and it must be conceded that the bodily injuries suffered by him as a result of the automobile accident on December 25, 1934, were caused, directly and independently of all other causes, by violent and accidental means.

The first question presented then is whether the injuries received by the insured, directly and independently of all other causes, wholly and continuously disabled and prevented him from the day of the accident from performing any and every kind of duty pertaining to his occupation. There was ample evidence to justify the jury in answering this question affirmatively. The principal duties of the insured as a salesman were to drive his automobile and solicit orders. There is not a particle of evidence in the record that he performed or was able to perform either of such duties. Dr. Herpe testified that Rebenstorf's condition precluded his performing said duties. It clearly appears from plaintiff's testimony that he neither did nor could perform any of the essential duties of his occupation and that he did not sell a single order of goods from the day of his accident until his death. The evidence disclosed that the insured, accompanied by his wife, was driven, usually in a taxicab, to his employer's place of business to report every Friday

during February and March, 1935, and defendant stresses this fact as showing that he was able to and did perform some of the duties of his occupation. It has been repeatedly held and defendant admits in its brief ''that in order to be wholly and continuously disabled'' it is ''not essential to prove a state of total helplessness.'' We repeat that under the facts in evidence the jury was warranted in resolving the question under consideration in plaintiff's favor.

The next question presented is whether under the terms of the policy Rebenstorf's death occurred as a result of the injuries received in the accident, directly and independently of all other causes. The injuries suffered by him required treatment by Dr. Herpe from the date of the accident on December 25, 1934, until he was operated upon April 1, 1935. It is true that at the time of his accidental injury Rebenstorf had a diseased condition of the gall bladder of possibly from 10 to 20 years' standing, that his gall bladder was filled with stones to such an extent that it had ceased to function but that it did not interfere with the functioning of his bladder and that he also suffered from a dilation and fatty degeneration of the heart of a number of years' standing. It is also true that prior to the accident none of these conditions interfered with his living or with his ability to earn a livelihood. He was in apparent good health and suffered from no serious ailment for five years immediately preceding the accident. There is not a particle of evidence in the record that either the gall bladder or the heart condition would have caused Rebenstorf's death within a reasonably short time except for the injury received by him in the accident. Defendant makes much of the testimony of Dr. Herpe that, in his opinion, Rebenstorf died from natural causes and that the direct cause of his death was heart failure. While the doctor did say that the direct cause of his death was heart

failure, he described the chain of events leading up to his death as follows: "The trauma precipitated an acute acerbation of the gall bladder condition for which I operated. The gall bladder condition caused a strain and a stress upon the heart, which produced heart failure and death."

In view of this testimony of Dr. Herpe and of the fact that Rebenstorf received an accidental injury within the terms of the policy, is the beneficiary to be defeated of her right to recover merely because that injury operated upon a physically imperfect body, causing an acute acerbation of the gall bladder condition as it then existed, which required an operation, which, in turn, caused a strain upon an existing weak heart? In a case of this character why should not the real test be whether or not the injury itself was accidental? If the accident, when operating upon either a healthy or unhealthy body, causes death by putting in motion a chain of events which can be directly traced back to the accidental injury, why then should not such accident be considered the sole cause of the death? If Rebenstorf had been instantly killed in the accident it could hardly be seriously urged that his death resulted in whole or in part from the pre-existing diseased condition of his gall bladder and heart. What difference in principle is there when the injury resulting from the accident is the motivating factor in a chain of events that results in his death? Except for his accidental injury, what mortal could have divined or predicted with any reasonable degree of accuracy how long Rebenstorf would have lived? We are impelled to hold that the question of whether Rebenstorf's death within the contemplation of the terms of the policy before us was caused solely as a result of his accidental injury was properly submitted to the jury and that there was sufficient evidence to warrant the jury in resolving this question in plaintiff's favor.

Clause 9 of the special provisions of the policy provides *inter alia* that it does not cover "accident, injury, disability or death . . . caused wholly or partly, directly or indirectly, by disease or bodily or mental infirmity or medical or surgical treatment therefor."

Clause 1 provides that there can be no recovery unless "such injuries shall, directly and independently of all other causes, result in" death.

These are the clauses of the policy which defendant claims preclude recovery by plaintiff and they must have been intended to have the same meaning since they relate to the same subject matter in the same contract.

The identical clause 9 in a policy issued by defendant was recently construed by the United States Circuit Court of Appeals, 7th circuit, in *Scanlan v. Metropolitan Life Ins. Co.*, 93 F. (2d) 942, decided November 30, 1937. In that case where the insured, having been injured in an automobile accident, died 20 days thereafter and one of the defenses interposed was that the evidence showed that death was caused in part by bodily infirmity, the court said:

"While the bodily infirmity need not be the sole cause of the death to defeat recovery under this policy, it is well settled that the 'cause' as here used, either sole or partial refers to something different than a disease or affliction rendered more serious by the consequences of the accident.

"One may recover on an accident policy such as here in issue although the insured suffers from bodily infirmities. If the accident brought about conditions from which death resulted, the fact that the insured was ill, aged or infirm, or had bodily or mental infirmities, would not bar recovery provided the accident excited the bodily infirmity into activity and death resulted. If the infirmity alone would not have caused death, it cannot be said to have caused death when the

immediate result was occasioned by an infirmity which became active only because of the accident. The infirmity may have made the insured less able to resist, but if the accident caused the condition which in turn affected the weak spot which did not resist as well as a healthy body, the cause is nevertheless the accident, and recovery cannot be avoided or evaded. *Pacific Mutual Life Ins. Co. v. Meldrim,* 24 Ga. App. 487, 101 S. E. 305; *Wachtel v. Equitable Life Assur. Soc.,* 241 App. Div. 172, 271 N. Y. S. 650; *Equitable Life Assur. Soc. v. Gratiot,* 45 Wyo. 1, 14 P. (2d) 438, 82 A. L. R. 1397; *Lewis v. Ocean Acc. & Guar. Corp., Ltd.,* 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129; *Bohaker v. Travelers' Insurance Co.,* 215 Mass. 32, 102 N. E. 342, 46 L. R. A. (N. S.) 543; *Meyer v. Fidelity & Casualty Co.,* 96 Iowa 378, 65 N. W. 328, 59 Am. St. Rep. 374; *Rowden v. Travelers Protective Ass'n,* 201 Ill. App. 295; *Prehn v. Metropolitan Life Ins. Co.,* 267 Ill. App. 190; *Horrie v. Industrial Casualty Ins. Co.,* 272 Ill. App. 252; *Manufacturers' Acc. Ind. Co. v. Dorgan* (C. C. A.) 58 F. 945, 22 L. R. A. 620; *United States Fidelity & Guar. Co. v. Blum,* (C. C. A.) 270 F. 946; *Fairclough v. Fidelity & Casualty Co.,* 54 App. D. C. 286, 297 F. 681.

"Our conclusion is that in an action on an accident insurance policy to recover for the death of the insured, testimony to the effect that the results which followed the injury as its necessary consequences, and which would not have taken place had it not been for the injury, caused the death of the insured, is sufficient to support a verdict that the injury was the proximate and sole cause of the death."

It will be noted that among the many supporting authorities cited are included *Prehn v. Metropolitan Life Ins. Co.,* 267 Ill. App. 190, and *Horrie v. Industrial Casualty Ins. Co.,* 272 Ill. App. 252. In the *Prehn* case, where the provisions in the policy were the same as those in the case at bar, the beneficiary proceeded on

the theory that on September 12, 1930, the insured arose quickly from a chair, that in so doing he ruptured his spleen and that as a result of the accident he died 5 days later, on September 17, 1930. During the trial it appeared that on the previous June 4, 1930, the insured fell from a scaffold while painting a church; that the scaffold was not more than 12 or 14 feet high; that about 10 days after his fall he was seen playing baseball; and that he appeared vigorous at the time. The attending physician testified with respect to the result of a post mortem examination after the insured's death that "I believe that his fall off the ladder caused a slight laceration in the spleen underneath the capsule, and that this further exertion on his part completed the act; by further exertion I refer to when he arose from the chair." The doctor had found a scar on the spleen of the insured, which, he testified, might have been caused by his fall from the scaffold. One of the defenses advanced there was that the death of the insured was contributed to by other causes than violent and accidental means, and after an elaborate discussion of the evidence the court said at p. 198:

"In urging a reversal of the judgment defendant's counsel contend that Prehn's death did not result from violent and accidental means independently of all other causes, and that the court erred in refusing defendant's motions, made at the close of plaintiff's evidence and at the close of all the evidence, to enter a finding and judgment for defendant. We cannot agree with the contentions. We are of the opinion that the evidence sufficiently showed that Prehn's death did result from such violent and accidental means and independent of other causes as rendered defendant liable under the certificate or policy sued upon, and that the court's finding and judgment are sufficiently sustained by the law. (See *United States Mutual Accident Ass'n v. Barry*, 131 U. S. 100, 121; *Lewis v. Ocean Accident &*

*Guarantee Corp.*, 224 N. Y. 18, 20, 21; *Higgins v. Midland Casualty Co.*, 281 Ill. 431, 435, 437; *Christ v. Pacific Mut. Life Ins. Co.*, 312 Ill. 525, 530, 531; *Vollrath v. Central Life Ins. Co.*, 243 Ill. App. 181, 184, 187; *Hibbs v. United States Fidelity & Guaranty Co.*, 262 Ill. App. 279, 286, 287.)''

In the *Horrie* case, 272 Ill. App. 252, where the defense was that the total disability of the insured did not result directly and independently of all other causes from the bodily injuries received by him, it appeared that in August, 1930, the insured discovered that he was passing blood in his urine and in October of that year one of his kidneys was removed; that during the following January, 1931, Horrie returned to work and continued working until March 12, 1931, when he slipped on the ice, fell and fractured his left hip while walking on the street; that the fracture was of a very severe character, causing complete disability; that there was no evidence of carcinoma at the time the fracture occurred; that Horrie remained in the hospital until July 2, 1931, when he returned home; that he was never able thereafter to bear his weight on his left leg, even with the aid of crutches; that about the latter part of September, 1931, he suffered a spontaneous fracture of the femur of the right leg, which examination disclosed was caused by a malignant growth or cancer; that about 2 weeks after this a swelling developed in the left hip; and that about 3 or 4 months after the fracture of the femur it was noticed that the left hip had greatly enlarged and cancer had developed at the point of fracture of same. Suit was brought upon the theory that the cancer in the left hip was the result of the accidental fracture thereof and was defended upon the theory that the disability was the result of a malignant cancer of the right femur and of the left hip, not caused by any accidental means, but by the metastasis or extension to those parts of

the body of the primary carcinoma of the kidney. There the court said at p. 256:

"We have carefully considered the evidence in this case, however, and conclude that the testimony of the operating surgeons that the infected kidney was removed together with all of the malignant tissues in connection therewith; that the malignant growth therein was of recent origin; that in their opinion no metastasis could have originated from the kidney region; that the cancer in the left hip was at the site of fracture; that the fracture was such as caused irritation, as shown by the photograph, and by excessive pain and that irritation is a well known cause of cancer; that said cancer in the left hip was primary and not a metastasis, is prima facie evidence that the fracture was the primary cause of the cancer. Whether this prima facie case was overcome by the expert testimony, given by the witnesses for plaintiff in error, was a question of fact for the jury to determine; and we would not be justified in reversing their judgment under these circumstances."

We have considered the authorities of this and other jurisdictions cited by defendant in support of its position, but since the facts in none of them are comparable to the facts here they are readily distinguishable from this case.

Defendant claims that the trial court erred in refusing to give to the jury the following instruction:

"The Court instructs the jury as a matter of law that if you believe from all the evidence that the accident aggravated a pre-existing disease so that the insured died as a result of the combined effects of the accident and the pre-existing disease, then you must find the issues for the defendant." If this proffered instruction contained a correct statement of the law, the trial court should have directed a verdict for defendant, but the subject matter of this instruction is

expressly stated not to be the law in *Scanlan v. Metropolitan Life Ins. Co., supra.*

Defendant also claims that the court erred in giving the following instruction:

"The Court instructs the jury as a matter of law that when an insurance company places certain phraseology in a policy issued by it for its own protection and benefit and it attempts to avoid liability because of an alleged violation of any such provision, then such provision is to be construed most strongly against said insurance company." This instruction contains a correct statement of law but it was inapplicable to any issue in this cause and should not have been given. However, having examined the given instructions in their entirety, we find that the jury was fully and fairly instructed on the real issues involved, according to both plaintiff's and defendant's theories, and are of the opinion that the giving of this instruction constituted, at most, harmless error. In 64 C. J. 986, it is said: "Where, however, it appears that the correct instruction must have so preponderated in the consideration of the jury that the erroneous instruction neither contributed to, nor controlled, the verdict, the charge may be upheld."

Such other points as have been urged have been considered, but in the view we take of this cause we deem further discussion unnecessary.

For the reasons stated herein the judgment of the superior court is affirmed.

*Affirmed.*

Burke, P. J., and Friend, J., concur.